

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**05/18/2010**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **ANTOINETTE DE LA FUENTE, AND** | § | **Case No. 03-43483-H4-13** |
| **LENORD DE LA FUENTE** | § | |
| | § | |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **ANTOINETTE DE LA FUENTE, AND** | § | |
| **LENORD DE LA FUENTE,** | § | |
| | § | |
| Plaintiffs, | § | **Adversary No. 08-03291** |
| | § | |
| v. | § | |
| | § | |
| **WELLS FARGO BANK, N.A.,** | § | |
| Defendant. | § | |

## MEMORANDUM OPINION ON DEBTORS' MOTION FOR AN ORDER OF CIVIL CONTEMPT AGAINST WELLS FARGO BANK, N.A.
[Adv. Docket No. 26]

### I. INTRODUCTION

This adversary proceeding involves a sad and frustrating tale of how two successfully reorganized debtors unsuccessfully attempted to deal directly with their home lender, Wells Fargo Bank, N.A. (Wells Fargo). Their communications concerned the proper amounts that they owe Wells Fargo pursuant to certain orders of this Court entered during their Chapter 13 case. Only when their efforts at direct dialogue failed did the debtors turn to their counsel for assistance. This assistance first came through the filing of the above referenced adversary proceeding. Second, it came through the filing of a motion for contempt (the Motion for Contempt) when Wells Fargo failed to correct the debtors' loan records pursuant to an agreed judgment that it signed  in order

to settle the adversary proceeding and avoid a trial. This Memorandum Opinion discusses the

reasons why this Court has decided to grant the Motion for Contempt.

## II. Factual and Procedural Background

### A.     Background of this Chapter 13 Case

On September 9, 2003, Antoinette De La Fuente and Lenord De La Fuente (the De La

Fuentes) filed a Chapter 13 petition, primarily to save their homestead from foreclosure. [Main Case

Doc. No. 1]; *see* [Adv. Doc. No. 1, ¶ 5]. Lenord works as a mechanic. [Main Case Doc. No. 24,

Amended Schedule I]. Antoinette raises their two sons. [Main Case Doc. No. 37, Amended Schedule

I]. In many ways, the De La Fuentes represent the American nuclear family, fallen on hard times, and

desperately trying to hold on to their piece of the American dream.

And, indeed, in order to keep their home, the De La Fuentes dutifully proposed a plan which

called for sixty monthly payments to the Chapter 13 Trustee (the Trustee), who would then make

distributions to their creditors, including their home lender.[1] [Main Case Doc. Nos. 40, 51 & 52]. On

June 14, 2004, the Court entered an Order Confirming the De La Fuentes' Chapter 13 plan (the

Confirmation Order).[2] Pursuant to the Confirmation Order, the De La Fuentes were required to make

---

[1] The initial lender on the De La Fuentes' home was Washington Mutual Bank, F.A. [Proof of Claim Register, Claim No. 1]. However, Wells Fargo took an assignment of this claim on June 27, 2007. [Main Case Doc. No. 61]. Hereinafter, whenever reference is made to the Chapter 13 Trustee having made payments to Wells Fargo, the Court intends the reference to include payments made not only to Wells Fargo, but also Washington Mutual Bank, F.A.

[2] Hereinafter, reference to "the Confirmation Order" refers to: (1) the order confirming the plan proposed by the De La Fuentes, and the language contained therein [Main Case Doc. No. 52]; (2) the Chapter 13 plan, and the terms and conditions set forth therein [Main Case Doc. No. 40]; and (3) the Summary and Analysis of Chapter 13 Plan [Main Case Doc. No. 51].

monthly payments to the Trustee, who, in turn, would disburse monies to their creditors, including Wells Fargo. The disbursements made to Wells Fargo were only for arrearages—*i.e.*, the amount in default as of the date of the filing of the Chapter 13 petition.  Under the Confirmation Order, the De La Fuentes themselves were required to make all regular monthly payments which became due after the petition's filing. Stated differently, the Trustee was the disbursing agent solely for amounts that were due pre-petition, and not for any amounts that became due post-petition.[3]

The De La Fuentes did in fact begin making payments in 2004, pursuant to the Confirmation Order, and continued to do so for the next five years; their plan ended successfully upon them making their sixtieth payment to the Trustee in 2009. During this five-year period, the Trustee distributed to Wells Fargo the amount of $5,349.19,[4] representing the arrearages owed under the Confirmation Order. And, after the De La Fuentes finished making all of their required payments under the Confirmation Order, this Court issued its order discharging the De La Fuentes. [Main Case Doc. No. 106].

Overall, the record reflects that the De La Fuentes were model Chapter 13 debtors. They filed their petition, obtained confirmation of their plan, and made all of their payments pursuant to their plan. Thus, they achieved the twin objectives of the bankruptcy process: they received a discharge;

---

[3] The practice of allowing debtors (as opposed to the Trustee) to make post-petition payments to home lenders is, with certain exceptions, no longer allowed in the Southern District of Texas. Rather, the Trustee now makes all distributions (both for amounts owed pre-petition and that come due post-petition). Debtors therefore need only worry about making one complete payment each month to one person—the Trustee—and the Trustee then has the responsibility to distribute the correct amount of funds to the appropriate creditors, including home lenders. *See Perez v. Peake (In re Perez)*, 339 B.R. 385, 414–17 (Bankr. S.D. Tex. 2006)  (*aff'd Perez v. Peake (In re Perez)*, 373 B.R. 468, 493 (S.D. Tex. 2007)).

[4] That the Trustee actually distributed this amount to Wells Fargo is reflected in the Trustee's Final Report and Account filed on September 21, 2009. [Main Case Doc No. 109]. This amount is the amount claimed by the original holder of the debt and lien, Washington Mutual Bank, F.A., when it filed its proof of claim on October 15, 2003. As already noted in footnote 1, Wells Fargo took an assignment of Washington Mutual's claim in June of 2007.

and their creditors, including Wells Fargo, received payment on their allowed claims. *See In re Lots by Murphy, Inc.,* 2010 Bankr. LEXIS 873, at *10–11 (Bankr. S.D. Tex. 2010) ("[T]he twin pillars of bankruptcy are: (1) the discharge of the debtor, in order to obtain a 'fresh start'; and (2) the satisfaction of valid claims against the estate.") (citing *Fin. Sec. Assur. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 188 B.R. 799, 807 (E.D. La. 1995) *aff'd* 116 F.3d 790 (5th Cir. 1997)).

### B.   Wells Fargo's involvement with the De La Fuentes

On June 27, 2007, Wells Fargo acquired the De La Fuentes' homestead loan from Washington Mutual Bank, F.A. [Main Case Doc. No. 61]. In January of 2008, the De La Fuentes were dutifully fulfilling their obligations under the Confirmation Order (including remitting their regular monthly payments to Wells Fargo in addition to sending their monthly payments to the Trustee, who was then distributing monies to Wells Fargo to cure the arrearage). Nevertheless, Wells Fargo sent the De La Fuentes a letter accusing them of being delinquent on their loan by $8,400.06. [Adv. Doc. No. 1, ¶18].[5] The letter threatened that unless the De La Fuentes became current with their payments by

---

[5] Paragraph 18 of the Complaint filed by the De La Fuentes to initiate the pending adversary proceeding sets forth in detail that they received this demand letter from Wells Fargo. Yet, in the Original Answer that Wells Fargo filed, Wells Fargo states that it "is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 18." [Adv. Doc. No. 6, Para. 18]. This statement strains credulity considering that Wells Fargo introduced the January 15 demand letter as one of its own exhibits at the pre-trial conference held in this adversary proceeding on April 16, 2009. [Wells Fargo Exhibit No. 7]. Wells Fargo, in filing a responsive pleading, has a duty of good faith in averring that it does not have sufficient information or knowledge to admit or deny an allegation. *Djourbachi v. Self*, 240 F. R.D. 5, 11–12 (D.D.C. 2006) ("[A] party 'may not deny sufficient information or knowledge with impunity, but is subject to the requirements of honesty in pleading. An averment will be deemed admitted when the matter is obviously one as to which a defendant has knowledge or information.' Moreover, a party 'may be held to the duty to exert a reasonable effort to obtain knowledge of a fact.'" (internal citations omitted)). Because a copy of the January 15 demand letter was clearly in Wells Fargo's possession, this Court believes Wells Fargo should have been more diligent in checking *its records* before filing the Original Answer. Its failure to be more attentive is symptomatic of how Wells Fargo has handled the De La Fuentes' loan, as is discussed in the remainder of this Memorandum Opinion.

February 14, 2008, Wells Fargo would foreclose on their homestead.[6] Knowing that the allegations in Wells Fargo's letter were incorrect, the De La Fuentes directly contacted Wells Fargo and attempted to correct the mistake. [Adv. Doc. No. 1, ¶ 19]. Nevertheless, Wells Fargo insisted, and the De La Fuentes, out of fear of losing their home, entered into a temporary forbearance agreement [Wells Fargo Ex. Nos. 5 & 6] and loan modification agreement in lieu of foreclosure on April 10, 2008.[7] [Adv. Doc. No. 1, ¶ 20]. This was in spite of the fact that the pre-petition mortgage arrears were already provided for in the Confirmation Order and, therefore, could not be collected in a different manner or time frame than set forth in the Confirmation Order without this Court's approval. Wells Fargo's actions therefore violated the Confirmation Order. Wells Fargo knew the De La Fuentes were Chapter 13 debtors and that both they and Wells Fargo were bound by the Confirmation Order; yet, Wells Fargo frightened the De La Fuentes into making payments to Wells Fargo in violation of the Confirmation Order.

---

[6] The letter was not sent to bankruptcy counsel for the De La Fuentes, and the De La Fuentes felt no need at that point in time to re-engage their bankruptcy counsel or any other attorney—no doubt because of their quite legitimate desire to try to resolve problems with Wells Fargo themselves and avoid incurring additional attorneys' fees.

[7] The temporary forbearance agreement (the Temporary Forbearance Agreement)  and loan modification agreement (the Loan Modification Agreement) are Exhibits 5 & 6 that this Court admitted at the pre-trial conference on April 16, 2009.
    The Temporary Forbearance Agreement stated that the De La Fuentes must pay the following amounts on the following dates: $2,748.86 on 1/29/2008, $960.49 on 2/24/2008, $960.49 on 3/24/2008, $960.49 on 4/24/2008, and $6,516.92 on 5/24/2008. Pursuant to the Temporary Forbearance Agreement, the De La Fuentes paid Wells Fargo $2,748.86 on 1/17/2008 (although the Complaint states that the De La Fuentes did not receive the Temporary Forbearance Agreement until January 30, it appears that some oral agreement was reached prior to that date), $960.49 on 2/19/2008 (plus a $20.00 phone fee), and  $960.49 on 3/21/2008 (plus a $20.00 phone fee).  Before making the April, 2008 payment of $960.49, the De La Fuentes received a phone call from a Wells Fargo representative stating that because they had timely made three consecutive payments pursuant to the Temporary Forbearance Agreement, the De La Fuentes now qualified for a loan modification and that if they paid $1,871.00, they would not have to make the $6,516 payment due for May 2008.  In the same conversation, the De La Fuentes paid $960.00 (plus a $20.00 phone fee) and paid the remaining balance of $911.62 (plus a $20.00 phone fee) on May 2, 2008. [Adv. Doc. No. 1].

C.      **The history of the pending adversary proceeding**


In June of 2008, approximately two months after entering into the Loan Modification Agreement and the Temporary Forbearance Agreement, the De La Fuentes decided to retain the law firm of Walker & Patterson, P.C. (W & P) to represent them in the main case after the Trustee took the position that they needed to modify the Plan. [Main Case Doc. No. 65]. W & P had not been initial counsel of record for the De La Fuentes, but the firm undertook the representation and resolved this matter with the Trustee, plus other matters relating to their Chapter 13 case. [Main Case Doc. Nos. 79, 81, & 96]. At some point after W & P began its representation of the De La Fuentes in the main case, the De La Fuentes reviewed with W & P the communications that they had exchanged with Wells Fargo and provided W & P with copies of the Loan Modification Agreement and the Temporary Forbearance Agreement. As a result of communications between the De La Fuentes and W & P, the former authorized the latter to file suit against Wells Fargo. Accordingly, on August 13, 2008, the De La Fuentes filed the Complaint initiating the instant adversary proceeding against Wells Fargo (the Adversary Proceeding), alleging willful violation of the automatic stay and violation of the Confirmation Order. [Adv. Doc. No. 1]. On September 19, 2008, Wells Fargo filed an Original Answer, primarily denying the De La Fuentes' allegations, and praying that the Court deny the relief sought by the De La Fuentes. [Adv. Doc. No. 6]. This Court issued a scheduling order, which set discovery deadlines, a pre-trial conference for April 16, 2009, and a trial date for the week of April 20, 2009. [Adv Doc. No. 2]. Thereafter, the parties conducted discovery and filed their respective pre-trial statements. [Adv. Doc. Nos. 10 & 11]. At the pre-trial conference on April 16, 2009, the parties announced that they were ready for trial, and this Court set the trial date for April 21, 2009.

**D.      The first "Settlement Agreement"**

On April 21, 2009, this Court called the Adversary Proceeding for trial. At that time, counsel

for both parties announced that they were in the process of negotiating a global settlement. Counsel

for the parties then recited into the record those terms upon which they had reached agreement. While

counsel for the De La Fuentes stated that the parties had reached agreement on many terms, he noted

that there were two material points over which the parties had yet to reach agreement:  the amount

of the De La Fuentes' attorneys' fees to be paid by Wells Fargo for prosecuting the Adversary

Proceeding and the amount of the monthly escrow payment to be paid in the future.[8] Counsel for both

parties asked the Court to conduct an immediate trial on the amount of attorneys' fees; and counsel

for each party stated that they would confer thereafter in an effort to reach an agreement on the

specific amount of the escrow payment.   *See* [Tape Recording, April 21, 2009 Trial at 9:22:03

a.m.—9:25:00 a.m.; 10:35:04 a.m.—10:36:06 a.m.].

The Court then heard testimony on the amount of attorneys' fees, and issued an oral ruling

from the bench awarding reasonable attorneys' fees to the De La Fuentes in the amount of

$25,895.00. The Court then requested counsel for both parties to submit an agreed judgment in

writing within one week and reminded them that this judgment needed to include not only the agreed

terms announced into the record, but also the fee award and the escrow amount that the parties were

to agree upon after further consultation. [Tape Recording, April 21, 2009 Trial, 10:35:04

---

[8] The phrase "escrow payment" encompasses two categories: insurance costs and taxes.

7

a.m.—10:36:07 a.m.].

Unfortunately, the parties thereafter failed to reach an agreement on the escrow amount. Not surprisingly, counsel never submitted a signed, written agreed judgment to this Court. However, on June 10, 2009, Wells Fargo unilaterally filed a Motion for Entry of Final Judgment [Adv. Doc. No. 12] requesting that this Court sign an order approving: (1) those terms announced into the record at the April 21, 2009 hearing; (2) attorneys' fees to the De La Fuentes in the amount of $25,895.00 (*i.e.*, the amount decided upon by this Court at the April 21 trial); and (3) the monthly escrow amount desired by Wells Fargo but which the De La Fuentes would not voluntarily accept.

On July 20, 2009, this Court issued an order denying Wells Fargo's motion and a Memorandum Opinion explaining the reasons for its decision.[9] [Main Case Doc. Nos. 18 & 19]. In its order denying Wells Fargo's motion, the Court also set trial for July 28, 2009. Moreover, the Court expressly stated in this order that any future negotiated settlement must be reduced to writing in the form of an agreed judgement and signed by all counsel of record.[Main Case Doc. No. 19]. In short, the Court was telegraphing to the parties that if they were going to resolve their dispute, they really needed to focus on **all** of the terms and reduce **all** of those terms to writing so that there would be absolutely no room for misunderstanding about what the duties and obligations of the parties were

---

[9] In its Memorandum Opinion on Wells Fargo's Motion for Entry of Final Judgment, this Court denied Wells Fargo's Motion on two bases. First, even if could be said that the parties did come to an agreement that was articulated by the oral announcement during the hearing of April 21, 2009, such agreement was not enforceable under the Texas statute of frauds. *See* TEX. BUS. & COMM. CODE ANN. § 16.01(b)(4); *West v. First Baptist Church of Taft*, 71 S.W.2d 1090, 1100 (Tex. 1934); *Khoshnoudi v. Bird*, No. 05-98-00388-CV, 2000 WL 1176587, at *5 (Tex. App.—Dallas 2000, no pet) (citing *West*, 71 S.W. 2d at 1100); *see also Edward Scharf Assocs., Inc. v. Skiba*, 538 S.W. 2d 501, 502 (Tex. Civ. App.—Waco 1976, no writ). Second, an agreement will not be enforced when parties include a condition precedent and then subsequently fail to meet that condition. *See Valley Ranch Dev. Co. v. F.D.I.C.*, 960 F.2d 550, 553 (5th Cir. 1992). Here, the De La Fuentes and Wells Fargo never reached agreement on a material term—namely, the amount of the monthly escrow. Accordingly, as this Court stated in the Memorandum Opinion: "Because the parties have failed to agree on the amount of the monthly escrow payment, the condition precedent has not been satisfied. The Court, therefore, will not grant the Motion for Entry of Final Judgment." [Adv. Doc. No.18].

in any settlement.

### E.      The second "Settlement Agreement"

On July 27, 2009, the day before trial, the parties entered into and filed an Agreed Final Judgment (the Agreed Judgment). The Agreed Judgment represented the parties' second attempt at settlement, but this time, all of the terms were reduced to writing and signed by counsel for both parties. Upon submission, this Court reviewed and signed the Agreed Judgment, which expressly ordered that: (1) the De La Fuentes' loan serviced by Wells Fargo was deemed to be contractually current through April 2009, with the next monthly mortgage payment due in May 2009; (2) the principal balance of the De La Fuentes' loan immediately prior to the posting and application of the De La Fuentes' May 2009 loan payment was deemed to be $66,572.80; (3) the De La Fuentes' monthly principal and interest payment is $551.69 and shall remain the same until the last scheduled payment, which is April 1, 2029; (4) all future monthly payments of principal and interest shall be applied as reflected on Exhibit A;  [10] (5) the De La Fuentes' escrow account shall show a positive balance of $1,700.00 as of April 31, 2009;[11] (6) until the next scheduled escrow analysis, the De La Fuentes shall pay, in addition to the principal and interest payment, $410.24 per month to be applied

---

[10] Exhibit A to the Agreed Judgment is an amortization schedule indicating the outstanding principal balance and amounts of principal and interest to be paid for each month through April 1, 2029 (which is when the last monthly payment is to be paid by the De La Fuentes). There is little doubt that Exhibit A is attached to the Agreed Judgment so that there would be absolutely no ambiguity about how much the monthly principal and interest payment would be, and how this amount would be applied against the balance owed under the loan.

[11] The parties mistakenly had a typographical error in the Agreed Judgment referencing April 31, 2009, when it is common knowledge that April has only 30 days. At the time the Court signed the Agreed Judgment, it construed the reference to April 31 to really be April 30.

to their escrow account; (7) the De La Fuentes' loan shall show no outstanding fees, costs, charges or corporate advances as of April 31, 2009;  [12]  (8) to the extent Wells Fargo is required to make correcting entries on the De La Fuentes' loan records to reflect the amounts set out in the Agreed Judgment, such correcting entries shall be completed within 30 days from the entry on the docket of this Agreed Judgment (*i.e.*, by August 26, 2009);[13] (9) nothing in the Agreed Judgment shall affect the special escrow account held by Wells Fargo which contains insurance proceeds paid as the result of damages to the homestead of the De La Fuentes; and (10) Wells Fargo shall pay the De La Fuentes' attorneys, Walker & Patterson, P.C., the reasonable fees and costs for prosecuting the Adversary Proceeding in the amount of $30,895.00, with such payment to be made within 10 days of the entry of the Agreed Judgment. [Adv. Doc. No. 23].

Having entered into the Agreed Judgment, the De La Fuentes believed, among other things, that all of their concerns over the inaccuracies of their loan records at Wells Fargo had been put to rest. In the words of Ms. De La Fuente: "When the settlement came through, and we got the final judgment from the Court and everything, I called your office [ *i.e.*, her attorney's office]. And we were happy and pleased." [Feb. 9, 2010 Tr. 11:2–4]. Unfortunately, the De La Fuentes' sense of closure was misplaced.

**F.      Discovery by the De La Fuentes of Wells Fargo's failure to comply with the Agreed Judgment**

The De La Fuentes first discovered that Wells Fargo was violating the Agreed Judgment when

---

[12] *See* footnote no. 11.

[13] The Agreed Judgment was entered on the docket on July 27, 2009. Therefore, Wells Fargo had thirty (30) days from this date—*i.e.*, by August 26, 2009—to make the correcting entries.

they received the Monthly Mortgage Statement dated 11/13/09. [Exhibit No. 2]. This Statement incorrectly reflected, among other things, that the unpaid principal balance of the loan was $70,938.84 [Exhibit No. 2]; it should have reflected that the unpaid principal balance was $65,753.16 pursuant to the Agreed Judgment. [Exhibit No. 1]. Thereafter, according to W & P's timesheets, Ms. De La Fuente met with Miriam Goott (Goott), an attorney at W & P, on November 18, 2009. [Exhibit No. 5]. The time sheets reflect that on November 22, 2009 and December 7, 2009, Goott worked on a draft of a motion for contempt. However, no motion for contempt was filed in December of 2009.

In January of 2010, Ms. De La Fuente went online to make the monthly payment to Wells Fargo. [Feb. 9, 2010 Tr. 7:10–14]. However, she was unable to make this online payment because when she hit the appropriate key on her computer to make the payment, her computer screen told her that she had to call Wells Fargo because of the status of her account. [Feb. 9, 2010 Tr. 7:15–18]. She therefore called Wells Fargo, and as she was on the phone, she noticed that the balance of the loan appearing on the screen had increased [Feb. 9, 2010 Tr. 7:19–21], a fact which surprised her because her husband and she had made all of the payments since May of 2009. [Feb. 9, 2010 Tr. 7:10–11]. She also noticed that the screen reflected that Wells Fargo had reversed several of the payments that her husband and she had made since May of 2009. [Feb. 9, 2010 Tr. 7:20–22]. She inquired about the payment reversals, and the Wells Fargo employee with whom she was speaking told her that "it was a computer glitch and that they would fix it. Give it a couple of days."[Feb. 9, 2010 Tr. 12:11–12]. And, indeed, the De La Fuentes waited a couple of days for Wells Fargo to correct both the payment reversals and the balance of the loan. Unfortunately, Wells Fargo failed to make these corrections; in fact, the balance had increased even further. [Feb. 9, 2010 Tr. 12:13–16].

11

Thereafter, still in January, Ms. De La Fuente once again tried to make a payment online, and was prevented from doing so. [Feb. 9, 2010 Tr. 14:21–22]. She, once again, called Wells Fargo "[a]nd that's when they told me that I had been put in bankruptcy status, and that I needed to make my loan current. And they wanted me to pay more than what I wanted to pay, that was my monthly payment. And I didn't want to pay more, because I didn't owe more than that." [Feb. 9, 2010 Tr. 14:24–15:3]. Thus, in the eyes of the De La Fuentes, Wells Fargo continued to violate the Agreed Judgment because, among other things, the balance on their loan still did not track with what the balance of the loan should be pursuant to the amortization schedule attached to the Agreed Judgment.[14] Stated differently, the De La Fuentes were now painfully aware that Wells Fargo had not corrected the entries in its internal records as required by the Agreed Judgment.

## G.      The filing of the Motion For Contempt

The De La Fuentes authorized W & P to file the Motion for Contempt, which was done on January 18, 2010. [Adv. Doc. No. 26]; [Exhibit No. 5]. On January 21, 2010, this Court, through the Office of the Clerk of Court, docketed a notice that the hearing for the Motion for Contempt would be held on February 9, 2010. [Adv. Doc. No. 27]. On January 22, 2010, counsel for the De La Fuentes sent notice of this hearing to counsel for Wells Fargo. [Adv. Doc. No. 29]. However, Wells Fargo did **not** file a written response to the Motion for  Contempt. Instead, Wells Fargo chose to simply appear at the hearing and defend itself.

---

[14]Although Wells Fargo was in violation of the Agreed Judgment in various respects, one of the provisions with which it did timely comply was that it made payment of the $30,895.00 in attorneys' fees that the De La Fuentes had incurred.

12

**H.      The hearing on the Motion for Contempt**

1.      The February 9, 2010 part of the hearing (the February 9 Hearing)

The hearing on the Motion for Contempt began on February 9, 2010. On this day, Ms. De La Fuente testified, and she did so very credibly.[15] Her testimony revealed that Wells Fargo was not in compliance with the Agreed Judgment in several respects.

First, Ms. De La Fuente testified about Exhibit No. 2. She noted that this Exhibit was the Monthly Mortgage Statement dated 11/13/09 that her husband and she had received from Wells Fargo. This statement sets forth that the unpaid principal balance is $70,938.84. She emphasized that this figure does not track with the language of the Agreed Judgment. The Agreed Judgment sets forth that the principal balance "immediately prior to the posting and application of the Plaintiffs' [*i.e.*, the De La Fuentes'] May, 2009 loan payment is $66,572.80." She also testified that her husband and she had made all of their monthly payments to Wells Fargo since May of 2009 [Feb. 9, 2010 Tr. 7:10–11]. Thus, there is no way that in November of 2009, the unpaid principal balance could be $70,938.84. The unpaid principal balance as of 11/13/09 would have to be in an amount less than the figure of $66,572.80 for May of 2009 set forth in the Agreed Judgment. And, indeed, a review of Exhibit A to the Agreed Judgment—which sets forth the amortization schedule to be used for the

_____

[15]In addition to adducing testimony from Ms. De La Fuente, counsel for the De La Fuentes introduced into the record six exhibits. This Court admitted the first four exhibits at the February 9 Hearing, and the two other exhibits (*i.e.*, Exhibit Nos. 5 & 6) were admitted at the February 23, 2010 hearing. Exhibit No. 1 is the Agreed Judgment; Exhibit No. 2 is the Monthly Mortgage Statement dated 11/13/09 that the De La Fuentes received from Wells Fargo; Exhibit No. 3 is the Business Online Account Activity maintained by Wells Fargo on the De La Fuentes' account showing entries made from 08/04/09 through 01/19/10; Exhibit No. 4 is the Business Online Account Activity maintained by Wells Fargo on the De La Fuentes' account showing entries made from 08/10/09 through 02/05/10; Exhibit No. 5 is the Invoice dated 02/22/10 from counsel for the De La Fuentes to the De La Fuentes for services rendered in connection with the prosecution for the Motion for Contempt; and Exhibit No. 6 is the Business Online Account Activity maintained by Wells Fargo on the De La Fuentes' account showing entries made from 01/05/10 through 02/05/10. With respect to Exhibit 5, the Court expressly did not admit certain hearsay statements within that exhibit; rather, the exhibits were admitted for the purpose of proving up the reasonableness of the attorneys' fees incurred by the De La Fuentes.

remaining life of the loan—indicates that, as of 11/01/2009, the unpaid principal balance is $65,753.16, which is an amount less than $66,572.80. Thus, as of the February 9 Hearing, Wells Fargo was not in compliance with the Agreed Judgment because the 11/13/09 Monthly Mortgage Statement which it sent to the De La Fuentes overstated the unpaid principal balance by $5,185.68 (*i.e.*, $70,938.84 − $65,753.16 = $5,185.68).

Second, Ms. De La Fuente testified about Exhibit No. 3. She stated that she found this page online in January 2010 when she looked up her mortgage account on the "Wells Fargo Business Online" website [Feb. 9, 2010 Tr. 9:15-21]. This document represents that the last payment received from the De La Fuentes was on 12/30/09. That is the good news; it is an accurate representation. Unfortunately, the bad news is that this document reflects that the outstanding principal balance is $71,337.82. Thus, Wells Fargo was not in compliance with the Agreed Judgment because this document reflects that the unpaid principal balance is not $65,632.98 (as set forth in the agreed upon amortization schedule attached to the Agreed Judgment), but rather $71,337.82—which means that this document overstates the unpaid principal balance by $5,704.84 (*i.e.*, $71,337.82 − $65,632.98 = $5,704.84). Further, even though the De La Fuentes had made their November and December 2009 payments, Wells Fargo's records reflect that the unpaid principal balance rose from $70,938.84 (*i.e.*, the incorrect figure set forth in the Monthly Mortgage Statement of 11/13/09) to $71,337.82 (*i.e.*, the incorrect figure set forth in the Business Online Account Activity from January of 2010). Stated differently, Wells Fargo's internal system increased the principal balance even when the De La Fuentes made timely payments.

But there is more. The online statement marked as Exhibit No. 3 contains a line that reads as follows: "Total amount due to make loan current: $8,934.72." Not surprisingly, Ms. De La Fuente

testified that this representation was wrong. She was very clear in stating that her husband and she were current on the loan. [Feb. 9, 2010 Tr. 9:24–10:8]. This Court agrees. Because: (a) the Agreed Judgment expressly stated that the De La Fuentes' loan was contractually current through April 2009; (b) the De La Fuentes had made all of their regular monthly payments to Wells Fargo since May of 2009 [Feb. 9, 2010 Tr. 7:10–11]; (c) the Agreed Judgment had been entered on the docket and become a final order [Adv. Doc. No. 24]; and (d) the Trustee had paid to Wells Fargo the entire arrearage of $5,349.19 pursuant to the Confirmation Order [Main Case Doc. No. 109], there is no way that the De La Fuentes needed to pay $8,934.72 to bring their loan current. They were current! Thus, Wells Fargo was not in compliance with the Agreed Judgment because according to the terms of the Agreed Judgment, the De La Fuentes were current through April of 2009; and given that they had made all of their payments from May of 2009 and thereafter—a fact, it should be noted, that Wells Fargo does not dispute—there is no way that the De La Fuentes needed to pay $8,934.72 to bring their loan current. The information in Wells Fargo's Business Online Account Activity therefore contradicted the representations that Wells Fargo gave to the De La Fuentes and to this Court in the Agreed Judgment.

Ms. De La Fuente's testimony about Exhibit No. 4 tracks with her testimony about Exhibit No. 3. She stated that she found Exhibit No. 4 online in February 2010 when she looked up her mortgage account on the Wells Fargo Business Online website [Feb. 9, 2010 Tr. 10:9–16]. This document reflects that the last payment received from the De La Fuentes was on 01/29/10. Once again, that is the good news; it is an accurate representation. Unfortunately, the bad news is that this document, just like Exhibit No. 3, reflects that the outstanding principal balance is a number different from what it should be based upon the agreed amortization schedule attached to the Agreed

15

Judgment. According to that amortization schedule, the outstanding principal balance—assuming that the De La Fuentes have made all of their payments through January of 2010, which they have—is $65,390.24. Yet, Exhibit No. 4, which Ms. De La Fuente printed off of the Wells Fargo Business Online website within 24 hours of the February 9 Hearing, reflects that the outstanding principal balance is $66,572.80. In other words, the outstanding principal balance is shown to be $1,182.56 greater than what Wells Fargo agreed it should be in the Agreed Judgment.

Granted, the figure of $66,572.80 is the figure referenced in the Agreed Judgment as the outstanding principal balance, but the Agreed Judgment unequivocally sets forth that this figure is the principal balance immediately prior to the posting of the loan payment made by the De La Fuentes for May of 2009. The problem for Wells Fargo is that because the De La Fuentes had made their monthly payments for each month since May of 2009, the balance of $66,572.80 had decreased. Thus, Exhibit No. 4 demonstrates that Wells Fargo was not in compliance with the Agreed Judgment because the outstanding principal balance figure was overstated and did not match with the figure set forth in the amortization schedule attached to the Agreed Judgment (*i.e.*, $65,390.24).[16]

But, once again, just as with Exhibit No. 3, there is more. The online statement marked as Exhibit No. 4 contains a line that reads as follows: "Total amount due to make loan current: $9,421.52." Not surprisingly, Ms. De La Fuente testified that this figure had increased from

---

[16]At the February 9 Hearing, counsel for Wells Fargo, in cross examining Ms. De La Fuente, spent time adducing testimony from her during which she acknowledged that on Exhibit No. 4, the "[o]utstanding principal balance" is shown to be $66,572.80. Counsel for Wells Fargo then asked Ms. De La Fuente whether this figure is the balance "as per the judgement of this Court?" and she responded in the affirmative. [February 9, 2010, Tr. 16:4–6]. Counsel then inquired "[s]o does it appear to you that that adjustment has been made?" and she also responded in the affirmative. [February 9, 2010, Tr. 16:7–9]. To the extent that counsel for Wells Fargo was attempting to adduce testimony to convince this Court that Wells Fargo was in compliance with the Agreed Judgment, his attempt must fail. By February 9, 2010, according to Schedule A attached to the Agreed Judgment, the correct principal balance was $65,390.24, not $65,572.80. And, indeed, counsel for the De La Fuentes, on redirect examination of Ms. De La Fuente, adduced testimony from her on exactly this point. [February 9, 2010, Tr. 19:11–21:17].

16

$8,934.72 (*i.e.*, the number in Exhibit No. 3) to $9,421.52. [Feb. 9, 2010 Tr. 10:9–23]. As already noted, the De La Fuentes were current on their loan in February of 2010, just as they were current on their loan in January of 2010. Hence, there is no way that any document for which Wells Fargo is responsible should be showing that in February of 2010, the De La Fuentes needed to pay $9,421.52 to bring their loan current. What is particularly peculiar about the figure of $9,421.52 is that it represents an increase of $486.80 from January of 2010 to February of 2010, while, at the same time, the De La Fuentes were making timely monthly payments to Wells Fargo. Thus, Wells Fargo was not in compliance with the Agreed Judgment because according to the terms of the Agreed Judgment, the De La Fuentes were current through April of 2009. Given that they had made all of their payments from May of 2009 and thereafter—another fact that Wells Fargo does not dispute—there is no way that the De La Fuentes needed to pay $9,421.52 to bring their loan current. The information in Wells Fargo's Business Online Account Activity therefore contradicted the representations that Wells Fargo gave to the De La Fuentes and to this Court in the Agreed Judgment.

After Ms. De La Fuente finished giving testimony, counsel for the De La Fuentes stated that they had no further witnesses to call in their case-in-chief on Wells Fargo's failure to comply with the Agreed Judgment. Counsel for Wells Fargo then informed the Court that Wells Fargo wanted to call one witness, but that this witness had been unable to fly to Houston due to inclement weather. The Court therefore agreed to continue the hearing until February 23, 2010, so that this witness could give testimony on behalf of Wells Fargo.

However, having heard the testimony of Ms. De La Fuente, and having reviewed the exhibits, this Court did make a finding that because the amortization table of the Agreed Judgment required

the principal balance to be $65,390.24 as of February 1, 2010, and because Exhibit No. 4 (the Wells Fargo Business Online Account Activity) showed the balance to be $66,572.80, Wells Fargo was therefore in violation of the Agreed Judgment. [Feb. 9, 2010 Tr. 25:6–26:16]. Citing *F.D.I.C. v. LeGrand*, this Court concluded that the De La Fuentes had met their burden in satisfying the three elements required to establish that Wells Fargo was in contempt of this Court's judgment—namely, the Agreed Judgment.[17] [Feb. 9, 2010 Tr. 26:10–15]; *F.D.I.C . v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995). The Court then stated that the burden now fell on Wells Fargo to demonstrate that it was unable to comply with the Agreed Judgment or that it had some other relevant defense. [Feb. 9, 2010 Tr. 26:17–19; 27:5–9]. The Court informed counsel for Wells Fargo that the Court would hear testimony from Wells Fargo's representative at the continued hearing to be held on February 23, 2010. [Feb. 9, 2010 Tr. 28:11].

Finally, because the Court concluded that Wells Fargo was in contempt of the Agreed Judgment due to the failure of Exhibit No. 4 to show that the principal balance was $65,390.24 (instead of $66,572.80), the Court issued an oral ruling that Wells Fargo would be liable to the Clerk of Court on a per diem basis in the amount of $1,182.56 for each day thereafter until the figure of $65,390.24 was showing as the principal balance.[18] [Feb. 9, 2010 Tr. 26:20–27:4]. The Court noted that upon hearing testimony from the Wells Fargo witness at the February 23, 2010 hearing, it would make a determination whether Wells Fargo had met its burden to establish that it could not comply with the Agreed Judgment and whether Wells Fargo would have to pay any amounts that accrued for

---

[17]This conclusion was limited solely to the incorrect principal balance indicated in Wells Fargo's records. At the February 9 Hearing, the Court expressly noted that it was making no ruling on Wells Fargo's other alleged acts of contempt. [Feb. 9, 2010 Tr. 27:22–25].

[18] The amount of $1,182.56 is the difference between what was actually appearing on Exhibit No. 4 (*i.e.*, $66,572.80) and what should have been showing on Exhibit No. 4 (*i.e.*, $65,390.24).

each day that passed where the figure of $65,390.24 was not showing as the principal balance. [Feb. 9, 2010 Tr. 27:10–13].

2.    The February 23, 2010 part of the hearing (the February 23 Hearing)

On February 23, 2010, Wells Fargo presented its case in chief by calling one witness, John Grissom (Grissom), and by introducing two exhibits.[19] Additionally, the De La Fuentes recalled Ms. De La Fuente on rebuttal, and also adduced testimony from their counsel on the amount of attorneys' fees that they had incurred in prosecuting the Motion for Contempt.

i.    Testimony of the Wells Fargo representative, John Grissom

Grissom identified himself as a senior counsel of Wells Fargo. [Feb. 23, 2010 Tr. 10:12–13]. He works out of a Wells Fargo office in Iowa. [Feb. 9, 2010 Tr. 1:12–13]. He stated that he directed his paralegal in July of 2009 to make the changes within Wells Fargo's system in accordance with the terms of the Agreed Judgment. [Feb. 23, 2010 Tr. 10:13–18]. He also admitted that the adjustments that his paralegal was supposed to make at that time included reducing the principal balance to the figure of $66,572.80. [Feb. 23, 2010 Tr. 10:19–21]. He then admitted that this particular adjustment was not done. [Feb. 23, 2010 Tr. 10:22–23]. When counsel for Wells Fargo asked Grissom why the adjustment was not made, Grissom responded: "This one was a mistake. It was one that fell through the cracks." [Feb. 23, 2010 Tr. 10:25–11:1]. Indeed, Grissom stated that he first learned that the

---

[19] The two exhibits of Wells Fargo which this Court admitted were Exhibit A and Exhibit B. Exhibit A is a one-page document that is untitled but unquestionably contains information about the De La Fuentes' home loan as of February 22, 2010. Exhibit B is a five-page document that is also untitled but unquestionably contains historical information about the De La Fuentes' home loan.

adjustment had not been made when the Motion for Contempt was filed on January    18, 2010—almost six months after the entry of the Agreed Judgment on the docket, and almost five months after the deadline for Wells Fargo to make the adjustments pursuant to the Agreed Judgment. *See* [Feb. 23, 2010 Tr. 11:7–11]. Thus, Grissom, by his own testimony, confirmed that Wells Fargo was not in compliance with the Agreed Judgment. Counsel for Wells Fargo thereafter attempted to adduce testimony from Grissom to convince this Court that Wells Fargo did not have the ability to make the adjustment or, alternatively, that Wells Fargo had some other defense.

First, Grissom stated that once he learned about the filing of the Motion for Contempt, he "directed my paralegal to work with the information systems people to get this account corrected." [Feb. 23, 2010 Tr. 11:19–21]. According to Grissom, these personnel undertook this task and made the appropriate adjustments pursuant to the Agreed Judgment. [Feb. 23, 2010 Tr. 11:22–23; 14:10-23].

Second, Grissom asserted that if, prior to the filing of the Motion for Contempt, he had received notice about Wells Fargo's failure to comply with the Agreed Judgment, the adjustment would have been made earlier: "Oh, absolutely absolutely. If I'd received a call or an e-mail from you or anything, we would have taken care of getting this done much sooner."      [Feb. 23, 2010 Tr. 15:17–19].

Third, Grissom emphasized that Wells Fargo's failure to make the adjustment in accordance with the Agreed Judgment by the thirty-day deadline set forth in that judgment (*i.e.*, by August 26, 2009) was not a willful failure on Wells Fargo's part. [Feb. 23, 2010 Tr. 11:2–6].

On cross-examination, Grissom unequivocally testified that Wells Fargo is now in complete compliance with the Agreed Judgment. [Feb. 23, 2010 Tr. 17:21–18:5]. Yet, on further cross-

examination, Grissom then had to concede that his statement was incorrect. First, he admitted that, pursuant to the Agreed Judgment, the monthly payment for principal and interest is $551.69, the monthly escrow payment is $410.24, and the sum of these two figures is $961.93. [Feb. 23, 2010 Tr. 19:12–23]. He then had to concede that Exhibit 2 (the monthly Mortgage Statement dated 11/30/2009) indicates that the combined monthly payment of principal, interest, and escrow is $984.00, not $961.93. [Feb. 23, 2010 Tr. 19:24–20:4]. Indeed, he admitted that all of the Monthly Mortgage Statements through February of 2010 indicated that the De La Fuentes had to pay $984.00 instead of $961.93. [Feb. 23, 2010 Tr. 19, 20:3–16].[20] Thus, he had to concede that Wells Fargo had been violating the Agreed Judgment by over-charging the De La Fuentes each month by $22.07 for the ten month period from May of 2009 to February of 2010.[21] [Feb. 23, 2010 Tr. 22:2–10].

Grissom attempted to explain away this violation of the Agreed Judgment by stating that as of close of business on February 22, 2010, Wells Fargo had made all the necessary corrections in its loan records to come into compliance with the Agreed Judgment. [Feb. 23, 2010 Tr. 12:16–19; 20:3–8]. And, indeed, Exhibit A (internal records of Wells Fargo) reflects that the total monthly payment is now shown to be $961.93. The problem, however, is that until Wells Fargo refunds to the De La Fuentes the $22.07 for each of the ten months that it overcharged them, Wells Fargo is indeed in violation of the Agreed Judgment, which expressly sets forth that the proper amount of the monthly payment is $961.93, not $984.00.

Grissom also attempted to navigate his way around this problem by stating that when Wells

---

[20] Aside from the Monthly Mortgage Statement, the Business Online Account Activity as of January 21, 2010 (Exhibit 3) also incorrectly reflects that the combined payment is $984.00 instead of $961.93.

[21] According to Grissom, the additional amount of $22.07 that the De La Fuentes paid each month was placed into a so-called "suspense account." [Feb. 23, 2010 Tr. 22:11–15; 24:11–25:9].

Fargo receives more funds than is required, the excess monies go into a "suspense account." [Feb. 23, 2010 Tr. 22:11–15; 24:11–25:9]. In other words, Wells Fargo does not return excess funds, but rather keeps them in an account which it controls. According to Grissom, that is what Wells Fargo did with the monthly excess of $22.07 that the De La Fuentes remitted. And, indeed, Exhibit A (internal records of Wells Fargo) shows that there is a suspense account for the De La Fuentes loan. But, there is a problem. Exhibit A shows that as of February 22, 2010, the balance of the suspense account is $109.76. Given that the De La Fuentes paid $22.07 for ten months, and that the sum of these ten payments is $220.70, there is a shortfall of $110.94 ( *i.e.*, $220.70 – $109.76) for which Wells Fargo cannot account. Indeed, when asked why Exhibit A does not show the suspense account to have $220.70 instead of $109.76, Grissom had to concede that: "I do not know the answer to that question." [Feb. 23, 2010 Tr. 23:1]. Thus, Wells Fargo's own records show that the "suspense account" has fewer funds in it then it should have. Wells Fargo has not properly accounted for all of these funds. Indeed, according to Grissom, any borrower, including the De La Fuentes, have the right to have the funds sitting in a "suspense account" applied against outstanding principal. [Feb. 23, 2010 Tr. 24:5–25:9]. Thus, if the De La Fuentes requested that Wells Fargo apply the $220.70 that they overpaid against their outstanding principal, Wells Fargo would have only $109.76 to apply. In other words, Wells Fargo could not even comply with its own internal procedures.

Wells Fargo is in violation of the Agreed Judgment in another respect. The Agreed Judgment expressly sets forth that "the Plaintiffs' [*i.e.*, the De La Fuentes'] loan shall show no outstanding fees, costs, charges or corporate advances as of April 31, 2009."[22] [Adv. Doc. No. 24]. Yet, in Exhibit A (internal records of Wells Fargo), there is a category entitled "LC DUE." When asked what this

---

[22]*See* footnote no. 11.

22

phrase means, Grissom responded: "Late charge due." The following exchange then took place

between counsel for the De La Fuentes and Grissom:

> Counsel for the De La Fuentes: "So this statement says that the debtors have a late charge?"
>
> Grissom: "Correct."
>
> Counsel for the De La Fuentes: "But they are current?"
>
> Grissom: "Yes."
>
> Counsel for the De La Fuentes: "Can you explain to me how that is possible?"
>
> Grissom: "They may have made a payment late. If they make a payment after the due date, they would have a late charge."
>
> Counsel for the De La Fuentes: "So, if the debtors have evidence that they made their payments on time and paid a late fee, that wouldn't be there, correct?"
>
> Grissom: "Should not be there."

[Feb. 23, 2010 Tr. 25:22–25:9].

There is no doubt that the De La Fuentes have timely made all of their payments with the

exception of their payments for October and December of 2009. [Ex. No. 3]; [February 23, Tr.

42:22–43:7]. Further, Ms. De La Fuente testified that when these two late payments were made, the

late fee was included with the regular monthly payment. [February 23, Tr. 42:20–43:7]. Indeed,

Exhibit No. 3 (Wells Fargo's Business Online Account Activity page) indicates that the De La

Fuentes were assessed two late charges in the six months prior to 01/21/2010—one on 10/16/09 and

one on 12/16/09. And Exhibit No. 3 also shows that the De La Fuentes made their monthly payments

shortly after these late fees were assessed, and included the additional amounts with their regular

monthly payment to pay for the late fee as well. Therefore, because the De La Fuentes made all of

their regular monthly payments, and also paid any late fees shortly after they were incurred, the De La Fuentes are totally current on their loan with Wells Fargo. In fact, Grissom himself unequivocally stated—not once, not twice, not three times, but four times—that the De La Fuentes were current. [February 23, Tr. 16:23–24; 16:25–17:1; 23:7–8; 25:16–17]. Moreover, Grissom unequivocally stated that there were no late charges imposed for any of the adjustments that Wells Fargo finally made on the eve of the February 23 Hearing. [February 23, Tr. 12:20–14:4]. Given all of this testimony, there is absolutely no basis for Exhibit A reflecting that the De La Fuentes owe a late charge of $78.72.[23] Accordingly, because the Agreed Judgment expressly represents that the De La Fuentes loan records shall show no outstanding charges, and because the De La Fuentes have made all of their payments (including payment of the two late charges for October and December of 2009), the late charge now appearing on Exhibit A violates the Agreed Judgment. Wells Fargo's records should actually show that there are no late charges due; and until the records so reflect, Wells Fargo is in violation of the Agreed Judgment.

Having had to admit that there were errors in Wells Fargo's records in violation of the Agreed Judgment, Grissom attempted to persuade this Court that the De La Fuentes' hands are sufficiently unclean that any relief they request should therefore be denied. For example, Grissom testified to the effect that the De La Fuentes or their counsel should have contacted Wells Fargo or him prior to filing the Motion for Contempt. According to Grissom, if they had done so, then Wells Fargo would have quickly made the corrections to the loan records and there would have been no need to file the

---

[23] It is worth noting that, even if the De La Fuentes did owe a late charge, the amount of $78.72 would be overstated. It is important to remember that Wells Fargo, in violation of the Agreed Judgment, was sending Monthly Mortgage Statements requiring the De La Fuentes to pay $984.00 per month rather than the correct amount of $961.93. Because the late fee is calculated as a percentage of the amount that should be paid, Wells Fargo, whenever it calculated the late charge, used the incorrect figure of $984.00 to arrive at the amount of the late fee.

Motion for Contempt. [February 23, 2010 Tr. 15:14–19]. Second, Grissom, in conceding

inconsistencies in the information set forth in the Wells Fargo's Business Online Account Activity

(Ex. Nos. 2, 3, & 6), suggested that the De La Fuentes were at fault for relying on this Business

Online Account Activity. Set forth below is the exchange between Grissom and counsel for the De

La Fuentes about why the Business Online Account Activity sometimes shows a line item that says

"Total Amount Due to Bring Loan Current" and other times does not:

> Counsel for the De La Fuentes (referring to Exhibit No. 6, which is the Wells Fargo
> Business Online Account Activity for January and February of 2010): "Why is it that
> on February 19[th] there isn't a line item that says "Total Amount Due to Bring Loan
> Current?"
>
> Grissom: "I can't answer that question."
>
> Counsel for the De La Fuentes: "So sometimes it's on there and sometimes it's not?"
>
> Grissom: "This is not an official record of Wells Fargo. This is their online process.
> This is a convenience for the customer. This is not considered an official record of
> Wells Fargo."
>
> Counsel for the De La Fuentes: "This is what the debtor has to look at to see if they
> owe money, if payments have been received. They shouldn't rely on this document?"
>
> Grissom: "Well, again, when they look at this in the middle of all the corrections that
> are being made to the account, it is going to be skewed by all of the changes that are
> being made. I mean, this shows that they were due for—next payment was due on
> May 1[st] of 2009. Clearly, that wasn't correct. But I don't know why it doesn't have
> the amount needed to bring the account up to date. I can't answer that question for
> you."

[February 23, 2010 Tr. 38:1–20].

Finally, Grissom blamed the computer system for Wells Fargo's failure to comply with the

Agreed Judgment. [February 23, 2010 Tr. 12:9–15, 15:2–8].

*ii.    Rebuttal testimony of Ms. De La Fuente*

Ms. De La Fuente gave very credible testimony that her husband and she had made all of their monthly payments and, when they missed the deadline on two of the payments, they not only paid the $961.93, but also simultaneously paid the late charge.  [February 23, 2010 Tr. 42:14–44:14].

*iii.    Testimony of Johnie Patterson, a partner at the law firm of Walker & Patterson, PC, counsel for the De La Fuentes*

Johnie Patterson (Patterson), a partner at W & P, which is the firm representing the De La Fuentes, gave testimony about the services rendered on behalf of the De La Fuentes in the prosecution of the Motion for Contempt. Patterson has approximately twenty years of experience practicing bankruptcy law and is board certified in consumer bankruptcy law. [February 23, 2010, Tr. 48:18–21]. Patterson also testified that Miriam Goott's hourly rate on this matter is $225.00. Goott is an associate attorney who has worked for W & P for seven years, and has done so as an attorney practicing bankruptcy law for approximately five to six years. [February 23, 2010 Tr. 48:22–49:1].

Much of Patterson's testimony concerned Exhibit No. 5, which is an invoice dated February 22, 2010, setting forth a description of the services rendered by both Patterson and Goott. The invoice reflects services rendered from November 18, 2009 (when Goott first consulted with Ms. De La Fuente about the inaccuracies set forth on the Monthly Mortgage Statement dated November 13, 2009) through February 22, 2010 (when Goott prepared for the February 23 Hearing). Patterson testified that the De La Fuentes were seeking an order from this Court that Wells Fargo pay the total

value of the fees and costs set forth in this invoice—a total of $3,754.00, representing the sum of $3,720.00 in fees for professional services and $34.00 in costs incurred in relation to the Motion for Contempt. He also testified that his clients want this Court to require Wells Fargo to pay the fees for services rendered by Goott and Patterson on February 23, 2010, which are not reflected in Exhibit 5. According to Patterson's testimony, Goott and he spent approximately two and a half hours each on this day in the courtroom. Goott's hourly rate is $225.00, which results in a value of $562.50 for her services rendered on February 23. Patterson's hourly rate is $325.00, which results in a value of $812.50 for his services rendered on February 23. The sum of $562.50 plus $812.50 is $1,375.00. [February 23, Tr. 46:15–50:15]. Thus, the total amount of fees and expenses which the De La Fuentes seek to recover from Wells Fargo is $3,754.00 plus $1,375.00—for a total of $5,129.00.

## III. CREDIBILITY OF WITNESSES

At the February 9 Hearing, counsel for the De La Fuentes called one witness, Ms. De La Fuente, to testify on Wells Fargo's handling of the mortgage loan. Ms. De La Fuente also provided rebuttal testimony at the February 23 Hearing. The Court finds Ms. De La Fuente to be very credible in all aspects of her testimony.

At the February 23 Hearing, counsel for the De La Fuentes also called Patterson, one of the attorneys representing the De La Fuentes. Patterson gave testimony about the services rendered by his firm on behalf of the De La Fuentes in prosecuting the Motion for Contempt. The Court finds

Patterson to be very credible.

At the February 23 Hearing, counsel for Wells Fargo called one witness, Grissom, Senior Counsel for Wells Fargo, to testify on Wells Fargo's handling of the De La Fuente's mortgage loan and the corrections made to Wells Fargo's records in relation to this loan. The Court finds Grissom's credibility to be lacking in certain respects. First, he gave a Shermanesque statement that Wells Fargo was now in compliance with the Agreed Judgment [February 23, 2010 Tr. 17:17–18:5], but then subsequently had to admit that Wells Fargo's records still contained errors in violation of the Agreed Judgment. [February 23, 2010 Tr. 22:9–23:8]. Second, he could not explain why there are late charges appearing on Wells Fargo's records. [February 23, 2010 Tr. 25:19–26:9]. Grissom's failure on these key points, combined with his nonchalance on the stand, reflects a troubling lack of perspective regarding how much is at stake for honest and diligent Chapter 13 debtors, such as the De La Fuentes, who are trying to hold on to their home, and how important it is for Wells Fargo to abide by this Court's orders when dealing with debtors. Grissom appears to be representative of the absence of any sense of urgency within Wells Fargo to maintain accurate records and comply with the law. Indeed, the following testimony from Grissom underscores this point:

> Question (from counsel for the De La Fuentes): "And is that a correct figure?"
>
> Answer (from Grissom): "Well, it is—I don't believe it is correct. However, it is correct because that's what we're presenting to the Court today."

[February 23, 2010 Tr. 27:14–17]. Apparently, it does not bother Wells Fargo, whose representative is a licensed attorney at law, to testify under oath in one breath that an escrow amount is both correct and incorrect. And, perhaps even worse, to say that this amount is correct because "that's what we're presenting to the Court today," even though he knows full well that it is incorrect.

28

## IV. CONCLUSIONS OF LAW

### A.     Jurisdiction and Venue

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(C), (L), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance."). Finally, this Court has jurisdiction over this proceeding because it involves the enforcement of an order issued by this Court; namely, the Agreed Judgment. *Travelers Indem. Co. v. Bailey*, 129 S.Ct. 2195, 2205 (2009); *In re Cano*, 410 B.R. 506, 546 (Bankr. S.D. Tex. 2009).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.     Wells Fargo has been in contempt of the Agreed Judgment for several months

#### 1.     The De La Fuentes have satisfied the elements of civil contempt by Wells Fargo

The Fifth Circuit has held that bankruptcy courts have civil contempt powers. *Matter of Terrebonne Fuel & Lube*, 108 F.3d 609, 612–13 (5th Cir. 1997). Pursuant to Fifth Circuit precedent, "[i]n a civil contempt proceeding, the party seeking an order of contempt need only establish (1) that a court order was in effect, and (sic) (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."*F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995) (citing *U.S. v. Hayes* 722 F.2d 723, 725 (11th Cir. 1984); *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009). "To determine compliance with an order, the court simply asks whether the respondent has [performed the acts required by the order]. If he has not, the burden shifts to the respondent to rebut this conclusion, demonstrate an inability to comply, or present other relevant defenses." *LeGrand*, 43 F.3d at 170 (citing *Matin v. Trinity Indus. Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *Star Brite Dist., Inc. v. Gavin*, 746 F.Supp. 633, 643 (N.D. Miss. 1990); *In re Bradley*, 588 F.3d at 264.

In the dispute at bar, the evidence unambiguously indicates that Wells Fargo is in contempt of this Court. The first element is satisfied because the Agreed Judgment became effective when it was entered onto the docket on July 27, 2009.

The second element is satisfied because the Agreed Judgment requires certain conduct by Wells Fargo. Specifically, the Agreed Judgment requires Wells Fargo, by August 26, 2009, to make correcting entries on the loan records of the De La Fuentes to reflect the agreements on various points concerning this particular loan all of which are set forth in the Agreed Judgment. The specific agreements set forth in the Agreed Judgment are as follows: (1) the loan of the De La Fuentes is contractually current through April of 2009; (2) the principal balance of the De La Fuentes' loan immediately prior to the application of the May 2009 monthly payment is $66,572.80; (3) the